Case No. 25-5339, SGCI Holdings III LLC, Mr. Young Kim, Federal Human Rights v. Federal Communications Commission et al., Mr. Straubisch for the appellants, Mr. Berman for the attorneys, and Ms. Kalin for the attorneys. Morning, counsel. Mr. Straubisch, please proceed when you're ready. Thank you, and may it please the court. Patrick Straubisch on behalf of the appellants, SGCI, and Mr. Kim, who is in the courtroom with us today. The decision below violated the cardinal rule of 12b-6 motions, assuming the truth of the allegations as pled and drawing all inferences in the plaintiff's favor. To the contrary, the district court drew inferences in the defendant's favor, wrongly imported its incomplete assessment of the merits into its standing decision, and dismissed the private defendants on a deeply flawed application of the Norr-Pennington Doctrine. In nearly 400 detailed paragraphs, the amended complaint describes unprecedented efforts by the defendants to obstruct and eventually pocket veto Sue Kim and Standard General's attempt to require TGNA. The combined actions of the defendants forced Standard General to pay a breakup fee in excess of $130 million that cost shareholders more than $1 billion of value. The amended complaint describes the FCC's admitted use of race, its departures from its standard timeline, its demands for information about other potential transferee that both its prior practice and federal statute forbade. The complaint describes Byron Allen's use of the FCC's racial diversity policies to advance his own business goals, his attempts to acquire TGNA for himself, his suggestion to Mr. Kim that he could smooth things over with the FCC if he were made part of the deal, his connections to the objectors who press for delay at every turn, asserting arguments foreclosed by agency precedent inconsistent with the facts and shaded with racial overtones. And the complaint cites numerous contemporaneous observers, including former FCC personnel, Republican and Democratic politicians, a sitting U.S. Senator, and NAACP officials who opined at the time that Mr. Kim was being unfairly treated, including because of his race. The decision below ignored many of these allegations and minimized others. Of course, no one wants to believe that a successful Korean-American entrepreneur would be the victim of racial discrimination in the 21st century, but the rules of pleading are the same for Mr. Kim as they are for all civil rights plaintiffs. This court should reverse the decision below and remand the case for further proceedings so Mr. Kim can have a chance at his day in court. The district court ruled that to the extent that your complaint quoted from documents, that those documents were considered to be incorporated into the complaint without converting the motion to dismiss into a motion for summary judgment. And that's the way that the district court analyzed the motion to dismiss. And I don't see anywhere in your brief that you said that that way of proceeding was improper. No, we don't have a problem with considering statements that are referenced in the complaint as part of the overall consideration of the motion to dismiss. We do have a problem with the interpretation and the selective consideration of facts that the district court engaged in when looking at some of those documents. No, I think what the district court did was the district court said that to the extent that your complaint quoted something from a document, then that document was, and it was explicitly referenced, then that document was considered incorporated into the complaint. And then it was fair game for your friends on the other side and for the district court to look at the context of what was in the entire document as opposed to the selective quotation that was used in the complaint. And I don't disagree with the procedural point. I think that standard rule is that documents quoted in a complaint are subject to at least being reviewed on their face. You don't necessarily have to credit the statements in those documents, and you certainly don't have to do what the district court did here, which is resolve all ambiguities in view of the defendant's claims, rather than assuming that the plaintiff's allegations are true and all inferences that the plaintiffs draw from that need to be credited at the 1286 stage. And that's where we think the district court really went over the line, either ignoring many of the allegations or adopting the defendant's view of what the document said in light of. It seems like part of what the district court did and what's, I guess, part of the key part of the dispute here is that to the extent that the agency expresses its reasoning for taking the action for setting this for hearing, we have those reasons, but what you want us to do is to take the allegations in your complaint as the real reasons for the agency's actions, right? Well, yeah, pretext is very commonly asserted in all sorts of racial discrimination cases. And I think as this court has repeatedly recognized, racial discrimination defendants rarely provide clear stated or direct evidence of racial discrimination. But I guess what I'm saying is that this is different than your normal case because you're using statements by people who might have been advocating something to the commission as evidence of the pretext, as opposed to statements or actions by the commission itself in a lot of instances. In some cases, not exclusively. We do, and I do want to emphasize something that the district court basically gave no weight to, which is that we have an allegation that Mr. Kim actually met directly with some of the FCC personnel involved, raised complaints about the way that his race was being used against him in some of the comments that the objectors were making, and the response as alleged in the complaint is not, that's not what it meant. It didn't say that. It was to laugh off the concern and say, you should hear what they say about you in private. And I would just submit that if you had an employee in a Title VII case who presented that kind of fact after raising concerns about racial discrimination, most courts would have no problem at the 12B6 stage, at the pleading stage, assuming that that's an inference at least that racial discrimination might be countenanced by the government actor in this case. You also have, like we said, the FCC's admitted use of race as part of the FCC proceedings. We have the disparate treatment that we allege Byron Allen's deals have received, both with the objectors not participating, but the FCC approving those under normal timelines, not imposing the kind of extraordinary delays that you have here. We obviously have pled a lot of facts about meetings that the FCC commissioners had with various people, ties that they had to Byron Allen and back to Dish. There is a litany of evidence here. I would say normally in a 12B6 posture when you're pleading a racial discrimination case, you need some factual allegations that at least provide some breadcrumbs that if you're given the chance to explore and discovery, they might lead you to a cognizable claim. Here we have at least half a loaf, if not a full loaf, the entire story. And VULO, of course, is very much on point here. You can't ignore the broader context of the allegations. You can't ignore the complaint as a whole. You can't pick one or two allegations here and basically assume that that's not right or assume that no one could ever conclude it. You have to take the – You mention – you say the FCC's admitted use of race, and you challenge the district court's analysis of Article III's standing to go against the FCC, and you argue that they have a policy of considering broadcast owners' race in the public interest analysis. Can you pinpoint what the policy is? The FCC has admitted on the record, and there's guidance on this, that they consider the increase of diversity of media owners as one factor in its overall assessment of public interest. Now, of course, the government has contested that that infects its consideration of any individual deals. There's also a lot of – I mean, this is like the, you know, DEI, diversity, equity, and inclusion, isn't necessarily tantamount to saying we make decisions or even that we consider race. Diversity can mean lots of different things, not necessarily racial and not all racial. And as I read it, going back to Adirondack, there is a constitutional prohibition against basing governmental decisions on race. So is there something more concrete? Well, yeah, there's a few things that are more concrete. First of all, we have an allegation in this case that the FCC, at the objector's request, requested specific information about an alternative transaction, which is way beyond the scope of what their statutory authority allows them to do in the public interest analysis. And that alternative transaction was for Byron Allen, who's an African American, and whose deals have been approved without objections from these objectors. I was asking about a policy. That seems like some circumstantial evidence from which you're asking us to draw an inference that there was a race-based reason. But you refer to the FCC's admitted use of race, and you refer to its policy of considering race. And, I mean, maybe you've already answered this question, that they reference an increase in diversity. Well, so I would agree with you that diversity could mean a lot of things. But, again, we're at the pleading stage here, so you have to draw inferences in our favor, and you have to assume our allegations as put are true. I could have some more time to address some more questions. So at this stage alone, I think we're sufficient. I don't think it's controversial to suggest that any time you bring a racial criteria, allegedly cabined or not, that is going to increase the possibility of unconstitutional use for race, the SFFA case is a prime example of a situation where there was an alleged use of race that exceeded the bounds of what the Constitution provided. We're at the motion to dismiss stage. You have to take our concerns as valid. And if we needed to shore that up at all, which I'm not sure that we do, the fact that the FCC agreed and ordered Standard General to produce information about an alternative bidder, and only one alternative bidder, Byron Allen, who had also said he was still in the fight for Tegna, who had called Mr. Kim, who was still expressing interest in the Tegna deal as the case was falling apart, that is enough of an inference. I just want to also point out that we shouldn't get too hung up on the policy point. If you look at the Navy chaplaincy case that we cited here, a policy does not need to be an official policy. It just simply has to refer to a discriminatory process or discriminatory act, and we've easily alleged that here. Does it matter to you that in terms of this FCC standing to challenge actions of the FCC, the FCC officials that you accuse of wrongdoing in connection with this deal are no longer in office? No, I don't think it does for two reasons. First of all, we've sued them in their official capacity, and so I don't think that their status as past employees necessarily reflects upon our ability to obtain future relief because of our lawsuit. But in terms of the likelihood of more action like this? No, I don't think so. If that's a mootness argument, that was not raised below, and the standards for mootness are different than the standards for standing in the first place, and so that could be raised, but it was not raised below, and it's not before this court. Well, what was raised below and what was part of the district court's decision was you have to show us the likelihood of future injury. Correct. You don't dispute that that's part of your verdict? We have to show a reasonable likelihood of future injury. Of course, I think even the district court acknowledged that a past incident of racial discrimination is a strong indicator of the potential for future discriminatory injury. This court's case, I'll go back to the Navy chaplaincy decision, which is very much on point here, and the defendants spend very little time discussing because it specifically describes how the fact that there was alleged discrimination, which we have to accept as true, and the fact that you were going to be back in front of, in that case, the promotion boards for ministers in the military, was sufficient to allege future injury. Mr. Kim is going to be back in front of the FCC. No one disputes that. He is regularly in front of the FCC. In the same way that the plaintiffs in Jibril, once they were allegedly unlawfully stopped or targeted for being terrorists, the fact that they were likely to fly again was sufficient to allege future injury. But it seems like the relevant question for those purposes would be not just whether you're going to find yourself before the same body again, which, as you mentioned, that may well be satisfied here, but whether the interplay of circumstances that gave rise to the injury is likely to recur. And it's a pretty complicated set of circumstances that gave rise to the injury here. It involves allegations of discrimination, but it involved the confluence of another bidder who was a part of a different racial community, and then there were some various things that had to happen in order for it to develop in the way that it did. And wouldn't we have to think about whether the complaint makes an adequate showing that that interplay of circumstances is going to, or that kind of interplay of circumstances is going to come about? Well, I think, first of all, as we allege, the public interest analysis, which includes some of the racial discriminatory concerns that we have in this case, does apply to renewal of licenses. So I think that that's sufficient. If you look at Navy chaplaincy, you did not need to show that you would be going before the same promotion board. You did not need to show that you would inevitably be up against somebody who was from a liturgical Protestant community. It's sufficient to show that you suffered discrimination in the past, allege that you discovered discrimination in the past, and that you are likely to be back in front of the same decision-making body, which still is going to apply the same allegedly unlawful standard. We think we've done that here. I may be misremembering, but aren't there other instances of license transfer applications by Mr. Kim that sailed through the FCC? I mean, this is just to the chief's point. So, yes, the court put weight improperly on the fact that he had previously obtained FCC approval, and I don't think that's any more conclusive, especially at the motion-to-dismiss stage, than the fact that the Jibril plaintiffs, for example, were able to fly unmolested at some point until they were searched and barred from flying under the terrorist watch list. The fact that you did not suffer racial discrimination at a point in the past, once you suffer racial discrimination, accepting that allegation is true, it's very much reasonable to believe that also— So, I think the way that it factors in is this. At that level of generality, I don't dispute the proposition. I guess the question is this. If the racial discrimination that's alleged to be suffered is the product of a confluence of a number of circumstances, which is to say it's not that the allegation is every time I come before the commission I suffer racial discrimination. It's that I suffered in that one instance because of the following set of circumstances. Then it seems to me that the question would be whether that confluence of circumstances is likely to come up again, because I don't think the complaint takes the position that every single time your client comes before the commission, there's going to be the prospect of racial discrimination that results in injury, because that's not the set of circumstances that gave rise to the injury, nor is it the set of circumstances that would potentially come about again that would potentially give rise to the same injury in another occurrence. I suppose that's potentially true, but consider the esophageal runner context, which we cite in our case. What was that considered? The grutter and the esophageal circumstances. In those cases, all the court found that was necessary for standing for injunctive relief going forward was that you were ready and willing and able to apply and you would be subject to a process that could treat you unfairly. Now, it's always possible that when you went to apply there weren't enough seats or there was a different criteria being applied, but as long as race was one of the things that might be considered that was sufficient for a future human injury in that case, and we think it's sufficient here. I don't want to skimp on the Norr Pennington argument, which was obviously a big focus of the briefs of the private defendants, and which, again, I think is completely mistaken under the pleading standard for 12b-6. We have obviously argued that Norr Pennington doesn't apply outside of the antitrust or the labor context. I think the district court acknowledged that that's an open question under circuit precedent. Of course, this panel doesn't need to decide that question. If it determines that we alleged the sham exception in our complaint, and I would just suggest that we easily alleged the sham exception in our claim, I don't think it's particularly close. There are a number of cases that we've cited, Israel from this circuit, the Lipitor case from the Third Circuit, the AT&T case, which involved an FCC case, and the landmark decision from the Second Circuit. All those cases are very similar on their facts that we have alleged both objectively baseless and a subjectively baseless reason for the petitioning activity. In setting aside Norr Pennington for a minute, just looking at whether the complaint pleads intentional racial discrimination by the private defendants, you argue that the highlight as evidence of race-based animus references to shadowy foreign investors and China's escalation with Taiwan. But as I read those in context, they seem to refer not at all to Mr. Kim's race, but to the facts that investment funds financing the deal are headquartered abroad. And I mean, he's not Chinese or Taiwanese. So tell me, setting aside those statements, are there other allegations that support an inference of intentional racial discrimination? Well, yes, there are. By the defendants? Sorry. Yes, there are. Obviously, there are allegations about coordination with Byron Allen, prior deals in which the same objectors did not raise the same concerns with respect to Byron Allen's deals, and this is on JA 53, paragraph 111 of the admitted complaint, where the objectors had not raised similar concerns. I read those and I get those. But one way of looking at them is favoring people, favoring people's politics. The thing that you really pointed to tie to race is this idea that there was some sort of anti-Asian expressly, anti-Asian sentiment express. And I take that reading about – I think I understand what your reading is, of the shadowy foreign investors comment in that whole paragraph, but more that really clinches the deal about intentional racial discrimination. Well, I guess I will answer the question, but let me just make one quibble with all due respect. Like, the whole rub is that it is one way to read it, but there's another way to read it. You know, I understand the pleading argument about you draw inferences, there's no inferences in light of the plaintiff. And just as in Navy chaplains, they were, Judge Tatel, referred to sort of the long history of religious discrimination in this country. I don't think that this court needs to blind itself to what has happened, particularly with respect to Asian Americans, how they've been treated as outsiders or as foreigners. Again, the As of Fay case is a good example of that. But, yes, we certainly have more. Again, it was the objectors who wanted – the private parties who wanted the FCC to demand that we produce alternative transaction information and only about Byron Allen. We have an allegation that the chair of the FCC laughed off the concerns that Mr. Kim raised and said you should hear about – you should hear what they say about you in private. We obviously have the connections between Byron Allen and his – What do you think that means, we should hear what they say about you in private? Well, I think that if the allegation was that the chairman expressed outright and said that is just referring to hedge funds and that is just referring to things and it's not racist and they don't – nothing that they're saying is racially discriminatory, that would be one thing, but that's not the allegation. And like I said, I think that a government official in this case, but any defendant who laughs away a concern raised about racism – and, again, we're not just guessing here. There was numerous public commentary at the time by former FCC chair people or FCC commissioners and others on both sides of the political aisle who very much believed that what was happening here, the inference to be drawn, was that his race was being used against him in these proceedings. And, again, he was being compared to a bail bid from an African-American communications person who was also still in the fight and offering to smooth things over at the FCC whose lobbyist was – Were there other failed bidders who were still in the fight? I believe there were some initial bidders, but no one who expressed an interest and told the press that they were still in the fight who called Mr. Kim after he was in front of the FCC and offered to smooth things over.  I mean, if this were in any kind of similar employment context, I don't think you'd have any problem. I mean, Hovey Garland is another case that we've cited that is, I think, very much on point with kind of what's sufficient to establish at the pleading stage. And, again, I really want to commend the court on the Knorr-Pennington stuff to look at the last few pages of the Lipitor decision, look at the decision in Landmark. Both those cases, by the way, I'll just note, included preliminary court orders for jurisdictional discovery in Lipitor. In the Connecticut case, the Connecticut Supreme Court had certified a case in both cases that eventually led to the abandonment of the licensing procedure, but that was not sufficient to establish that the concerns were objectively baseless for purposes of the sham exception. I'm sure my colleagues don't have additional questions for you at this time. We'll give you a little time for rebuttal. Appreciate it. Thank you. Good morning. May it please the court. Andrew Birney on behalf of the Federal Appellees. The district court correctly concluded that plaintiffs failed to establish sanding to seek prospective relief on either their equal protection claim or their ultra-virus claim based on the Communications Act. Although past legal violations aren't themselves sufficient to show a substantial risk of future injury, here plaintiffs failed to plausibly allege either racial discrimination or a violation of the Communications Act in the first place. And putting aside the absence of any credible allegations as to past injuries, the allegations in the complaint are insufficient to show a substantial risk of future injury. With respect to the past, the Tegna transaction, which is what this case is really about, I think plaintiffs face a number of independently insurmountable obstacles. Just to start with the most obvious one, the Media Bureau issued a painstakingly thorough written decision explaining why multiple issues associated with the transaction required a hearing. Now, in attempting to impugn that written opinion, I heard Mr. Strawbridge in his argument refer to statements by former members of the FCC, senators, objectors. The only alleged statement they've identified by anyone in the FCC, I think, is this alleged statement, which we of course dispute was made by Ms. Rosenworcel on J.I. 86 at the November 22 meeting with Mr. Kim. Now, even assuming that she said what the complaint says she said, that statement doesn't have a racial dimension to it at all. It doesn't show that she had even seen the statements by the objectors that he raised, that she agreed with Mr. Kim's interpretation of them, and I'll get to those statements by the objectors themselves in a second if I can, let alone that she shared their view. And then to say that that somehow impugns the decision of the Media Bureau months later, let alone pushes a risk of substantial injury years after the fact, now that she's left the agency, even at the pleading stage, that's just multiple bridges way too far. So when you strip away just that statement, what you're left with for the most part is these statements by the objectors to which plaintiffs refer. Now, I mean, these aren't statements by my client, obviously, so maybe Ms. Kalin would want to object them, discuss them more directly. And our frontline argument, of course, is that these statements aren't attributable to the federal defendants in the first place. But, I mean, if you look at those statements, Judge Wilkins, I took Mr. Strawbridge to agree that they were cited and relied on the complaint, so, of course, the district court properly considered them. I mean, my submission to you is if you look at JA 344 to 348, this is plaintiffs' response to the petitions to deny the applications in which they really quite explicitly invoke race as a reason to approve the transactions and fault the objectors for not addressing it. And then you look at the objectors' response, starting on, I believe, page 389 of the JA, and those statements say that what they object to is media concentration. There's just no way to read those statements as evidencing any negative use of race. As Judge Contreras noted, the allegations of racism just melt away at the slightest bit of scrutiny. And there's certainly no basis of reading those statements as so obviously racist that they're somehow attributable to the federal defendants such to call into question its decision. It seems like your friend on the other side says that what the district court did was fail to grant all inferences in favor of the plaintiff. And so to the extent that they can select quotes from a document and say that they support their inferences, the response is not for you to try to select other quotes and say, well, they support my inferences. What's your response? So my response to that is twofold, Judge Wilkins. The district court was required to accept all well-pleaded allegations, it's true, but there are two things the district court is not required to do. The district court is not required to defer to plaintiffs' characterization of materials that are incorporated that flatly contradict those materials themselves said. And the district court is not to the extent they try to attribute those statements to the federal defendants. That's a legal conclusion, not a factual allegation that's entitled to any deference. And here the allegations are just plainly insufficient. Again, even if you credited their interpretation of those statements to call into question the federal government's ultimate decision here. As to I want to talk about this question of is there policy. I was frankly of considering race in the public interest analysis of individual applications. I was frankly a little bit surprised that they doubled down on this the way they did in the reply. If you look at the materials they cite at footnotes 29 and 30 at JA 50 in the complaint, those are clearly those longstanding materials which date back I think to 1978 and which they haven't actually challenged as unlawful in this case, involve things like setting ownership limits on particular markets for a number of reasons, including to allow access to nontraditional minority and female potential owners. That is quite different from considering the race of prospective acquirers as part of the public interest analysis in approving or denying individual applications. We're not aware of any such policy. They haven't pled any such policy. As to the naval chaplaincy case, I think that case is quite different from this one in two respects. It really illustrates the defects in the claims here. In naval chaplaincy, you had two things. First of all, there was statistical evidence showing that non-liturgical Protestant chaplains weren't being promoted at the same rates as other chaplains. But also the policy at issue in that case was acknowledged by the Navy and was quite specific. The policy was you had small members of seven boards who all voted anonymously, who rated individual applicants from zero to 100, and so any one member could essentially veto in secret a prospective chaplain with views he or she disagreed with, and that policy wasn't disputed by the Navy. So when you had the combination of those two things, that supported a claim of the substantial risk of future injury, and you just don't have either of those two things in this case. Judge Pillard, you asked if it's relevant that the relevant officials have, in the case of Ms. Rosenworcel, left the agency. In the case of Ms. Saar, no longer oversees the media bureau. We don't think it's necessary for the court to decide this case, but to be clear, we do think it's relevant in the following sense. Obviously, if you have a case where, for example, a plaintiff seeks retrospective relief from an agency rule or regulation, it's not relevant that an official capacity defendant has left the agency. Similarly, if what you had here was a challenge to some identified policy that was being applied prospectively in the future, again, the fact that the official capacity defendants have switched wouldn't be relevant. But here you have very specific – here you have allegations that a specific FCC and specific FCC officials at a particular point in time, based on animus towards Mr. Kim or racism or other impermissible considerations, affected the pocket veto of this transaction. I mean, Ms. Rosenworcel, for example, is mentioned, I think, more than 90 times in the operative complaint in this case. So in light of that kind of claim, it is obviously relevant that we have a very different FCC today, and that those two officials will no longer be involved in any future transactions that plaintiffs – in the future. Judge Srinivasan, I think you're right to say that – as I took your question to Mr. Strawbridge to indicate that this transaction had a particular set of features that even putting aside the weakness of the allegations of past discrimination just don't apply here. The transaction Mr. Kim points to at JA-158, there's no allegation that there's any competing buyers for that possible transaction that Mr. Allen in particular involved. And so when you combine that with the fact that, again, the relevant officials have left the agency and the weakness of the past allegations of discrimination, we think that's just plainly insufficient to show a substantial risk of future injury.  Just briefly on the Communications Act claim, and then I'll sit down. As we point – we think that claim really fails for any of four reasons, first of all, any of which isn't sufficient. First of all, we don't think there's – to the extent that that claim is based on the September 2022 document request, there's no claim that that request really injured plaintiffs in any way, since the hearing designation order did not rely on alternative buyers, let alone Mr. Allen in particular just doesn't discuss that at all. There's also the reason the district court gave, which is also right, that to the extent that request was aberrational, there's no evidence that it will be repeated, let alone to plaintiffs. There's the reason the district court also gave, which is that that is not a collateral claim and it's barred by the Hobbs Act exclusive review provision. And finally, even if plaintiffs were to overcome all of that, what it would be left with is an ultra-virus claim, which is one of the highest standards known to the law. Plaintiffs must show a blatantly lawless violation of a clear statutory mandate. Here, what you have in that request is one parenthetical as one subpart of an 11-part request for documents. It clearly – the literal language clearly is just referring to transactions among the companies, even putting aside that Section 310D doesn't restrict, let alone clearly restrict, the information the agency can request as opposed to what it can rely upon. So that claim clearly fails on any number of reasons, and if the Court has no further questions, we would ask that the Court affirm the judgment. Thank you, Counsel. Thank you. Callan. Good afternoon, Your Honors. May it please the Court. Michelle Callan on behalf of the 10 private appellees in this case. I'd like to address plausibility, which is where most of the discussion from my friend on the other side addressed. But before getting into that, I'd like to begin where the district court focused, which is petition clause immunity. There is no dispute here that all of the activities that the private appellees engaged in here, meeting with agency officials, submitting letters to an agency, that all these activities involved some form of petitioning the government. Now, appellant's main contention is that the district court erred in applying petition clause immunity outside of the antitrust context. But this Court has already held in the Venetian Casino case that petition clause immunity and the Noor-Pennington Doctrine is a direct consequence of the First Amendment itself, not any sort of consequence of antitrust law or the Sherman Act. Yeah, but we also have law reconciling equality, statutory requirements, and constitutional requirements with First Amendment rights that allow a determination of intentional prohibited discrimination to include speech, even though speech would otherwise be constitutionally protected. I guess there are carve-outs from Noor-Pennington for libel, slander, defamation, to say that it nonetheless should apply to intentionally racially discriminatory speech. I mean, let's say the private defendants here had gone en masse and said, don't you dare let this individual get a big contract. I mean, I don't want to articulate gross racial stereotypes, but they say he's a member of such and such an ethnicity, and those people are low down and can't be trusted. And then the government responds. It just seems to me like not necessarily obvious that the petition right wins out over private parties fueling government decisions and causing them, based on intentionally racially discriminatory reasons. Sure. So it does in private civil litigation, Your Honor. So in the situation that Your Honor contemplates, there's a regulatory regime whereby to seek direct appeal of an agency that engages in that sort of behavior. And that's precisely the sort of situation where there's an appeal to the full commission and then an appeal ultimately to this court through the traditional regulatory process. But the correct approach to rectify that sort of situation is not with civil litigation because there is the petition clause immunity. And there is room in the petition clause. There's civil litigation all the time that alleges fraud, and I don't think there's a petitioning out to a fraud allegation. That's correct, Your Honor. That's where the sham exception would fit in, right, because in a fraud situation. Part of the sham exception could fill that, but it's also, I think, just a generally recognized notion that you don't have to go through Norah Pennington and fraud. I mean, Norah Pennington and sham when you have a suit that's predicated on  It just seems like there's not a First Amendment defense to fraud allegations. There's a merits defense to fraud allegations, and you were going to get to the merits point. But it just strikes me that this kind of complaint, the first thing that leaps to mind isn't that this complaint can't go forward because of the First Amendment. It may be that there's some problems with the complaint's allegations that would prevent it from going forward based on the nature of the allegations that are being made and why they don't suffice to get past the 12B6 bar. So the second part of that is certainly true, Your Honor. The complaint here does not sufficiently allege, meet the plausibility pleading standard. But because it's undisputed here that all the activity that's being engaged in is petitioning, there's no plausible allegation of fraud. There's no plausible allegations that overcome the sham exception. Why don't you focus on whether there are plausible allegations that allege intentional racial discrimination or national or ethnicity discrimination? Certainly, Your Honor. As to the allegations of discrimination, the allegations here take isolated snippets of statements entirely out of context and piece them together in a way that materially misrepresents the content of those statements. So to just one example that Your Honor, Judge Piller pointed out when my friend on the other side was before this court was the allegations about the Taiwan Strait, which arise from a letter that a lawyer had sent to the commission in petitioning the government on behalf of clients referencing geopolitical conflicts. It references the war in Ukraine and it references geopolitical tension in the Taiwan Straits. And that's part of an advocacy for the FCC to consider whether or not there's foreign investment here such that there could be foreign influence on the media. These are all traditional considerations that the FCC engages in part of its process. The FCC has obligations to look at foreign ownership, right? That's part of the statutory requirement? That's correct, Your Honor, as part of the public interest standard. So the allegations here simply come nowhere near the sorts of level of plausible pleading of some sort of racial animus at issue here. I'd like to just address one point, though, on the consequences of rejecting the petition clause immunity argument here, because when it comes to allegations of a conspiracy, like the allegations that are set forth here, if there's the ability to attach liability and allege this sort of threadbare conspiracy, rational actors will think twice before they come to an agency and advocate in front of an agency. This sort of advocacy is precisely what the petition clause immunity is designed to protect. They thought twice before using racially charged terms or saying things that could be construed as reflecting racial animus. Would that be a loss? Would that be a chill that we should be worried about for First Amendment reasons? I think so, Your Honor, because the First Amendment doesn't just protect speech people like. It protects all kinds of speech and it can protect even speech that people don't like. But I think here in particular, when the speech is so severely taken out of context in order to manufacture some sort of conspiracy, there's the concern that. Sort of a merits argument about the whether it's plausible in these allegations, but assume that it is entirely plausible, you know, that the John Birch Society comes in and says to the FCC, you really need to deny Mr. Kim or Mr. Allen or anyone for reasons of race, ethnicity. And the FCC says, good idea. We hadn't thought of that. And they act. Petition clause applies to the private defendants. I mean, I guess you could have a claim against the FCC, but private defendants protected by the petition clause. Yes, Your Honor, because that is the scope of the First Amendment and First Amendment immunity. It applies even to speech we don't like. And in the context of petitioning the government, when the if the government were to accept that that that's representation and then make a government decision based off that representation, especially in the agency context like here, there's the traditional agency appellate review. And I'll note that this is but it doesn't protect them if they were employers and they were directing a hiring team the same way. There's no. And if it's a public employer, there's no First Amendment reason that you couldn't say, you know, that speech was was supports a finding of illegality under Title seven or. So I think if it's petitioning, if it's petitioning the government, then it is protected speech absent the sham exception, Your Honor. And it's not including intentional racial discrimination. So if it's intentional racial discrimination that meets the standard in the sham exception, then that's where the petition clause immunity does not apply. And that the district court properly applied the Norah Pennington test in order to answer that question. Is this petitioning protected under it's not a jurisdictional issue, right? Norah Pennington. So it would it is not something that actually has to be addressed. That's correct. That's correct. Your Honor. The court has no further questions. We don't. OK, thank you, counsel. Just probably will give you two minutes for a rebuttal. Sure. I think that the court should be a little bit, at least give some equal weight to the consequences of applicants for FCC transferred licenses, being subjected to racial discrimination and the effect that that might have on their willingness to come forward. Indeed, there's allegations in the complaint that Mr. Kim has had to structure some deals differently in order to avoid the racial discrimination that happened here. There's a lot of discussion about the terms in the letter and how any reasonable person reading that letter can it can infer any racial discrimination. I think the court understands our argument on that and the fact that some of that stuff could be read to refer to Asians as as as outsiders. But I want to talk about all the other evidence of racial discrimination here that I think standing alone would be sufficient to get us past the 12B6 hurdle. First of all, you have the fact that they're not supposed to compare people to other transactions. And they issued a request at the objectors, you know, urging for alternative buyer information. And they specified that the only alternative buyer transaction info that they wanted was from Byron Allen, the same person who had previously bid, who was still in the fight, who had connections to the good friend group and all the other private defendants. We allege that the objectors in this case did not object to the Apollo Cox deal, even though there was Cayman Island funding in that. There were no shadowy foreign individual references in that case. We note that none of the objectors objected to the two deals that are cited in the complaint regarding Byron Allen. We've obviously alleged that the FCC precedent barred the concern about retransmission fees and barred the concern about newsroom consolidation or the loss of jobs as improper for the FCC to consider. And the policy at the end of the day, it's not just a diversity policy. It's a minority ownership policy. And the allegation here is that they were comparing Mr. Kim and treating him differently than they would have if Byron Allen had been the proposed purchaser. And there's plenty of allegations that support that as to all of the defendants. I thought it was telling that the government's attorney felt the need to, my friend on the other side, felt the need to start with the merits of the case instead of accepting the allegations as true and dealing with that. I do think that he misstated the 310 argument, as the district court did. We're not challenging the request for information in and of itself, although that was not a final order and we had no opportunity to pursue that at the FCC. We're challenging what 310D specifically prohibits, which is the comparison of the applicant to another alternative transaction or another alternative buyer. That's what's prohibited. And the request for information is probably the most blatant example of the FCC departing from its policies in favor of a person of a different race who was interested in the deal, who was still in the fight for the deal. So I think that that's more than sufficient, even if you ignore the letter, which of course we don't. And that's why so many people from so many different backgrounds, as alleged in the complaint, felt that Mr. Kim was being treated differently because of his race by both the FCC and the private parties. Obviously, Judge Blard, you're correct, the First Amendment is not any kind of absolute defense in this case. We actually do allege misrepresentation. The district court rejected our misrepresentation claims that we had not come forward with a material fact. That's obviously the wrong standard. That's the summary judgment standard, not the 12B6 standard. We alleged that the objectors continued to complain about Mr. Kim's intention to cut jobs when he had previously been told multiple times that that was Tegna's preexisting management policy. That's in the complaint. I'm sure my colleagues don't have any questions for you. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan; Pillard; Wilkins